REED *v.* FUTRALL, RECEIVER.

4-4994

Opinion delivered April 11, 1938.

*Beaumont & Beaumont,* for appellants.

*Gordon E. Young,* for appellee.

GRIFFIN SMITH, C. J.   Charles Albert Reed brought this suit to set aside two mortgages on lots in the city of Malvern.

Levi Reed died intestate January 6, 1926.   July 9, 1928, Mrs. Charlotte Alberta Reed, wife of the intestate, applied for and was granted letters of administration. Although the application was made two and a half years

after her husband's death, Mrs. Reed did not file an inventory, nor was any ever filed.

October 9, 1928, the administratrix filed this petition with the probate court: "The undersigned petitioner would most respectfully state that . . . said deceased died seized and possessed of . . . fractional lots 4 and 5 in block 53 in Malvern, Arkansas. That . . . said lots were vacant and unimproved, except one old house in very bad condition, and that your administratrix has expended considerable money in erecting two new houses on said lots in order to receive an income therefrom, and that said houses are now renting for $30 per month each. Your petitioner used some of her own means in improving said lots, and is now badly in need of said funds that were used out of her private money. There is no other indebtedness on said property. Your petitioner therefore prays an order of this court authorizing her to borrow, as administratrix of said estate, from the Bank of Malvern, the sum of $1,500 for paying off all claims against said property; and same has been improved by her, that it would be to the best interest of the estate to borrow said sum of $1,500, and therefore she asks this order of this court."

The petition was approved and the loan was made. The mortgage was dated October 15, 1928, due in twelve months, with interest at eight per cent.

November 1, 1929, Mrs. Reed petitioned for authority to borrow as administratrix $1,800 from the First National Bank. The prayer of the petition was granted and the loan was completed.

March 30, 1932, the administratrix petitioned for authority to borrow $1,958 for the purpose of repaying the loan of 1929, "which amount includes principal, accrued interest, and insurance." This petition was approved and the loan was executed.

The petition of November 1, 1929, was: "At the time of the death [of Levi Reed] said lots were vacant and unimproved, except one old house in very bad condition. Your administratrix has expended money in erecting two new houses on said lots in order to receive an

income therefrom. Said houses are renting for $30 per month each. Said petitioner used some of her own means in improving said lots and is now badly in need of said funds. . . . There is no other indebtedness on said property. Your petitioner therefore prays an order of the court authorizing her to borrow from the First National Bank the sum of $1,800 to paying off all claims against said property, including what she has expended out of her personal estate. She verily believes that the two houses and lots are now worth $2,500 each. . . . Since there are no other claims against said property, and same has been improved by her with borrowed money which is now due, it is necessary to borrow said sum of $1,800 . . . with which to pay the indebtedness . . . and prevent a sale thereof.''

It will thus be seen that there were three mortgages: One for $1,500, one for $1,800, and one for $1,958. It is admitted that a part of the proceeds of the $1,800 loan paid the $1,500 obligation. It is also in evidence that the $1,800 item was paid from the $1,958 transaction, although the record was not satisfied.

Levi Reed and Charlotte A. Reed owned property independently of each other, the approximate value of which is not satisfactorily shown as to either. At the time of the death of Levi Reed, those in interest, other than his wife, were appellant Charles Albert Reed, a son, and four grandchildren. The grandchildren, who were children of a deceased son, were defendants below, but when the chancellor dismissed the complaint of Charles A. Reed for want of equity, they were granted the right to join in this appeal.

Indebtedness secured by the $1,500 mortgage having been paid with funds secured from the $1,800 loan; and the $1,800 loan, in turn, having been paid from the $1,958 loan, the question directly at issue is whether the estate shall be required to pay the $1,958 item:

Appellants contend that each mortgage was subject to cancellation for the reason that the orders of the probate court were void.

It is contended by appellee that act 195 of 1927 authorized the probate court to make orders permitting the administratrix to borrow from the First National Bank, and that the obligation of $1,958 is valid even if it should be found that there was no authority to mortgage the property as security for money advanced by the Bank of Malvern.

Act 195 is: "Administrators, executors and guardians . . . are . . . empowered to borrow . . . for the purpose of paying obligations secured by lien on any property belonging to said estate wherever situated." Section 2 of the act provides that when an administrator presents to the probate court a petition asking permission to mortgage real property of the estate "for the purpose of raising money to pay obligations secured by liens against any real property," the probate court shall examine the petition "and hear the evidence," and if satisfied that it would be to the best interest of the estate, the court shall grant the petition.

The fact that thirty months intervened between death of the intestate and appointment of the administratrix would indicate that there were no debts against the estate; or, if indebtedness existed, it was discharged by Mrs. Reed, who neither at the time of her appointment nor prior to her first petition made record of any claims.

Mrs. Reed died June 19, 1932. Her granddaughter, Mrs. Florence Reed McDonald, was appointed administratrix in succession. She was also appointed administratrix of the estate of her grandmother. Appellant's suit to cancel the mortgages was filed December 17, 1932 —six months after the death of his mother. Subsequent to the time the suit was filed, Mrs. McDonald, as administratrix, paid the First National Bank $100 as interest on the $1,958 loan.

In substance, appellant Reed testified: He did not know, until after his mother's death, that she had been appointed administratrix. He had lived in Tulsa, Oklahoma, since 1915, but returned to Malvern immediately after his father's death and stayed with his mother until the two houses referred to in the petitions were com-

pleted in July or August, 1926. The houses cost about $2,200 each, exclusive of labor put into them by appellant, who estimated that his services were worth $700, for which he had not been paid. Cost of construction was paid from six loans made by the Bank of Malvern, secured by liberty bonds owned by his father. At the time of his death the father owned $6,000 of liberty bonds and had $1,000 in gold. Exhibits to appellant's testimony were photostatic copies of the loans alleged. These loans were made during January, February, March and May, 1926, aggregating $4,550, and showed upon their face that they were secured by bonds. Other than doctors' bills and funeral expenses, there were no claims against the estate, and funeral expenses and doctors' bills were paid from estate funds. The houses were completed two years before letters of administration were applied for. Appellant denied that he had knowledge that his mother had mortgaged the property.

There was testimony on behalf of appellee that Mrs. Reed advanced her own money to build the houses. This testimony, like that of appellant Reed, is unsatisfactory, in that it is based upon the understanding of the witness, general information, and impressions.

Thomas W. Roland, who with his father, Andrew I. Rowland, represented the administratrix as attorney, testified: "I knew at the time this petition [for loan from Bank of Malvern] was made that Mrs. Reed had spent out of her personal funds at least $1,500; and inasmuch as there were no outsiders, and it was a family affair, and it being agreeable to all the parties concerned, she borrowed the money on this property to repay her for her personal money that was expended. . . . At the time this first mortgage was made Albert Reed [appellant] was here in Malvern and had knowledge of it, and he also was the one that built the houses. . . . It was agreeable with all of the heirs, including the plaintiff [appellant Reed] that she should be repaid for the money expended; that there was no money in her hands as administratrix to repay her, and that Albert Reed and Florence McDonald and Bill McDonald and all of them

thought it was proper that they should borrow the money to pay Mrs. Reed. That money was borrowed, and all of them contemplated repaying the loan to the Bank of Malvern out of the rents of the two houses. . . . At the time Albert Reed was building those houses I talked with him and Mrs. Reed both, and both of them . . . considered it a good investment. Albert Reed knows that his mother had money that she had made out of a little business of her own, and he knows that she used that money to apply on building those houses.''

J. W. Fulton, who was cashier of the First National Bank at the time the first loan by that institution was made, testified: ''At the time our board of directors were considering the application for the loan, I questioned the right of an administrator to borrow money and execute a mortgage on the estate's property. Some investigation was made, and we were assured that our loan was to refinance an already existing mortgage, and that said loan was legal if made in conformity with the advice and order of the probate court.''

The record indicates, without establishing, that some of Mrs. Reed's money did go into the expense of construction; but it is also inferable that the estate's funds were mingled with her own, and that administration was treated as a private transaction, in the belief that the methods adopted were satisfactory to the parties in interest. The grandchildren lived with Mrs. Reed and were supported by her, either personally, or from estate funds, or both. The various transactions, viewed entirely in the light of moral considerations, are not such as to give rise to equitable relief. However, the law in this state has been definitely construed in a manner contrary to appellee's contentions.

In *Stuckey* v. *Stephens,* 115 Ark. 572, 171 S. W. 908, Ann. Cas. 1917A, 133, J. W. Stephens died testate, having named his wife executrix of his will. She was adjudged insane, and Stuckey was appointed administrator with the will annexed. He brought suit in chancery, alleging receipts of $10,718.69 and expenditures of $12,751.61. He further alleged that his final settlement had been ap-

proved, that he had been discharged as administrator, and that the difference of $2,032.92 between receipts and expenditures represented funds of his own spent in administration. Exhibits to the complaint showed that debts of ony $618.58 had been probated against the estate and Stephens had twice that amount of money in the bank at the time of his death. Shortly after his appointment, Stuckey applied to the probate court for an order directing him to finish cultivating and to gather growing crops, and a considerable sum of money was thus expended under direction of the court. Directions were also received from the court to lease the lands of the estate. This was done, and in his settlement Stuckey charged himself with rents received. One of the probate court orders, attached to the complaint, showed that the administrator received directions from the court to make certain repairs to the family residence, and also to build fences. One item for which the administrator took credit, was: "To C. S. Maynard, balance in full payment for dwelling, $3,250." Other large sums were spent in repairs, and in addition the administrator made advances to the testator's children, and to the widow, or for her benefit. In his settlement the adminstrator made no charge of commissions against the estate.

The opinion says: "It is not the policy of the law to encourage or permit the administrator to expend the money of the estate for any purpose except to pay the debts of the decedent, or expenses incurred in the course of administering the estate to pay the debts personally due by the decedent. The administrator, as such, has nothing to do with the education of the children, nor the support of the widow, nor with the permanent improvement of the lands of the estate, further than is necessary to make these lands a source of income for the payments of the debts. Indeed, under the statute, he has no control whatever over the lands except for the payment of debts. . . . The case is that of an administrator who has expended money without lawful authority so to do, who asks that a lien be declared upon the lands of the estate and those lands ordered sold in payment of the

money thus expended. Such a proceeding is contrary to the policy of our administration law, and the chancery court was without jurisdiction to grant the relief asked.''

The general rule announced in 24 Corpus Juris, § 484, p. 69, is: ''An executor or administrator, as such, has no inherent authority to borrow money, and loans to the representative do not constitute valid claims against the estate or entitle the lender to interest thereon, although the representative may make himself personally liable; and the rule in this respect is not changed by the fact that the money was borrowed for the benefit of the estate, although under such circumstances there may be a right of subrogation. . . . Statutes are sometimes found which sanction borrowing with the creation of a lien, although usually upon due investigation and a previous order from the court.''

This proceeding by appellant, being in the nature of a collateral attack on judgments of the probate court, must fail unless the judgments are void, and such invalidity must appear from the face of the record, or it must be shown that the court lacked jurisdiction of the subject-matter.

While the decision in the Stuckey case was handed down before act 195 of 1927 became a law, the rule declared is not affected by the later statute. In the Stuckey case it was said: ''It is not the policy of the law to encourage or permit the administrator to expend the money of the estate for any purpose *except to pay the debts personally due by the decedent.''* (Italics supplied.)

The act of 1927 merely authorizes administrators, executors, and guardians, to borrow money ''for the purpose of paying *obligations secured by liens.''* (Italics supplied.) The law of administration was not otherwise enlarged by act 195.

In *Rightsell* v. *Carpenter,* 188 Ark. 21, 64 S. W. 2d 101, in an opinion written by Chief Justice JOHNSON, the holding in *Rose* v. *W. B. Worthen Company,* 184 Ark. 550, 42 S. W. 2d 1002, was expressly overruled and effect was given to § 5037 of Crawford & Moses' Digest. It was also held that § 5037 was not repealed by act 195

of 1927, but that power of guardians to mortgage the homestead except for purposes expressly recognized in the act was withdrawn. Although act 195 groups "administrators, executors, and guardians," and deals with them collectively, the decision in the Rightsell case involved only the rights of a guardian as expressed in § 5037.

It is our view that appellee was charged with knowledge of the probate records of Hot Spring county. Before the probate court could acquire jurisdiction to authorize execution of a mortgage by the administratrix, the petition must have contained an allegation that the funds were required to pay a debt secured by lien. No such declaration is there. On the contrary, the petition affirmatively shows that the administratrix had expended money "in erecting two new houses on said lots in order to receive an income therefrom."

There is no independent order of the court restating the facts, or reciting that oral testimony was heard; nor is the act of approval based on any information other than that contained in the petition. The court's indorsement is: "Petition examined and administratrix is ordered to borrow $1,500 from the Bank of Malvern, and execute mortgage on lots for security. This 9th day of October, 1928. C. F. Walters, probate judge."

It must be held, therefore, that this order was void.

The petition and order of November 1, 1929, in consequence of which the First National Bank made its first loan, are strikingly similar to the petition and order of November 9, 1928. The petition does not even allege that the debt in favor of the Bank of Malvern was secured by mortgage, unless that fact is to be inferred from the expression, "It is necessary to borrow said sum of $1,800 with which to pay the indebtedness now against said property and prevent a sale thereof."

Surely it cannot be seriously urged that in making this loan the First National Bank was justified in believing that the money would be used exclusively in discharging obligations secured by liens. It may be assumed, and the evidence shows, that officers of the First National

knew of the indebtedness due the Bank of Malvern, and saw that it was paid. But this does not, in record form, supply the probate court with jurisdictional recitations which should have appeared in the petition as a condition precedent to the court's right to grant the authority. Indeed, the probate judge testified with respect to the $1,800 loan: "I did not deem it my business to interrogate them. There was no controversy about it, and it was subscribed and sworn to. Mrs. Reed had come to me several times in connection with the estate and advised with me about it. I know that she talked to me about the estate several times. Let me state further, in connection with this case, that it was never my policy to investigate petitions of any kind when I thought they were regular and everyone was acting squarely, or doing the thing they thought was best."

It is urged by appellee that if the mortgages are held to be invalid, still Charles A. Reed and Florence Reed McDonald are estopped from setting up such invalidity; that Reed participated in the building operations, counseling his mother as to advantages to the estate from anticipated rentals; and that Mrs. McDonald, as administratrix in succession to her grandmother, paid the First National Bank $100 as interest on the loan of $1,958.

It is our opinion that the action of the chancellor in dismissing the complaint for want of equity is contrary to the weight of evidence on the question of estoppel, and that with respect to validity of the mortgages, the decree is erroneous as a matter of law. It is, therefore, reversed, and the cause is remanded with directions to cancel the two mortgages in question and the debts secured by them.